\*NOT FOR PUBLICATION\*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

| | |
|---|---|
| NEW JERSEY MANUFACTURERS : | |
| INSURANCE GROUP a/s/o : | |
| VICTORIA FISHBEIN-KOLES, : | |
| : | Civil Action No. 08-4995 |
| Plaintiff, : | |
| : | |
| v. : | **OPINION** |
| : | |
| HEARTH & HOME TECHNOLOGIES, : | |
| : | |
| Defendant. : | |

_____:

**WOLFSON, United States District Judge**:

This matter comes before the Court by way of a motion for reconsideration filed by Defendant Hearth & Home Technologies, Inc. ("Defendant" or "Hearth").  Defendant seeks reconsideration of the Court's May 5, 2010 Order which denied it summary judgment on Plaintiff New Jersey Manufacturers Insurance Group's ("Plaintiff" or "NJM") subrogation product liability claims.  In that Order, the Court denied summary judgment, holding _inter alia_, that the Plaintiff was entitled to rely on New Jersey's indeterminate product test. [1] Citing K & G Men's Company, Inc. v. Kibalko, No. 06-5768, 2010 WL 1931131 (D.N.J. May 12, 2010) ("K & G"), as persuasive case law decided after the May 5th ruling, Defendant asks this Court to reconsider its indeterminate product test ruling.  For the reasons that follow, this Court grants Defendant's motion for reconsideration.

_____

[1]     While the parties use the term "indeterminate product defect test" relevant case law terms use the phrase "indeterminate product test."   This Court will use the two interchangeably in this Opinion.

## I.     BACKGROUND

As the parties are familiar with the factual background of this matter, the Court will only briefly recount the facts necessary for this Opinion.  Ms. Victoria Fishbein-Koles[2] purchased an outside-vented, gas "Heat & Glo" fireplace manufactured by Defendant.  Upon purchasing the unit, Ms. Fishbein-Koles hired a general contractor to build and install a frame for the fireplace.  The frame was built between two sets of sliding glass doors.  Ms. Fishbein-Koles then hired both a plumber and an electrician to place and secure the proper connections.  Fishbein-Koles Dep. at 12:8-12.  As explained by Plaintiff's expert,

> [t]he appliance is a totally sealed combustion heater designed to have the appearance of a wood burning fireplace.  The appliance is of double wall construction for conveyance of heat energy into an area where the appliance is installed.  The combustion chamber is sealed on one side with heat resistant glass so that the combustion process is visible.  The remaining sides, top and bottom are enclosed with metal.  There is a ceramic panel designed to have the appearance of brick lining the base and sides of the combustion chamber.  There is a burner designed to support ceramic replicas of wood logs through which natural gas fuel combusts.  These logs were placed by the appliance installer [sic].

> * * *

> The appliance was fitted with a simulated fire screen on the exterior face of the glass pane sealing the combustion chamber.  As no embers are generated by the appliance[,] and as the glass pane already seals the combustion chamber, the simulated fire screen appears to be decorative only.

See NJM Insurance Group's Brief in Opposition to Motion In Limine, Exh. C. at 2 – 3.[3]

Ms. Fishbein-Koles had an electrician place a separate "On/Off" switch in her bedroom closet.  Ms. Fishbein-Koles testified that this switch was "really for emergency

---

[2]     Throughout the briefing, the parties refers to Ms. Koles-Fishbein and Ms. Fishbein-Koles.  I will use the latter, as that version of her name is used in the case caption.

[3]     Although the Court struck the expert report submitted by Mr. Glenn Frederick, the factual description of the unit is useful to provide context.  Moreover, Defendant did not challenge this aspect of the report in its prior motion to exclude.

purposes" and therefore was left in the "on" position, unless it was necessary to "turn off all electrical contact to the fireplace."  Fishbein-Koles Deposition at 16:6-15; 17:13-24; 18:4-7. On the occasions when Ms. Fishbein-Koles wished to use the fireplace, she would manually turn it on by using the on/off switch or the remote control.  Id. at 19:11-19.  The flames were ignited by using the push/turn flame-control knob.  Id. at 28:14-16.

The fireplace was located in the bedroom upon a raised hearth.  Ms. Fishbein-Koles decorated the hearth with a large silk floral arrangement; two large candlesticks holding pillar candles, lamp with a lampshade; several unframed pictures across the front of the unit; and several framed pictures to the side of the fireplace.  Id. at 32:1-36:25.  Although Ms. Fishbein-Koles did not use the fireplace daily, when she did use it her practice was to wake up, turn the fireplace on, brew coffee in the kitchen, and return to her bedroom to read.  Id. at 26:2-6; 28:19-21.

On the morning of June 7, 2007, Ms. Fishbein-Koles, using the remote control, turned on the fireplace and went downstairs to brew coffee.  Within minutes she smelled something "odd, like a down draft" from her bedroom.  Id. at 28:24-25.  Ms. Fishbein-Koles returned to her bedroom to see fire "coming out of the grill" from the Heat & Glo unit.  Id. at 30:6-13; 31:16-19.  In an attempt to extinguish the fire, she poured a bucket of water onto the flames, which successfully eliminated them.  She then called her insurer, NJM, and reported the incident.

That same day, Patrick J. McKinley ("McKinley"), a fire investigator, visited the scene.  McKinley is a certified fire and explosion investigator, certified by the National Association of Fire Investigators ("NAFI").  See McKinley Dep. 6:22-24.  According to him, there was a hole in the fireplace screen, and there were burn patterns on the ceiling above

the fireplace area.  On a subsequent visit, McKinley asked Ms. Fishbein-Koles to recreate any items on the hearth at the time of the fire.  The items on the hearth included some candles, photographs, and a lampshade—which was slightly singed.  After the investigation, NJM paid out $87,631.17 on the claim.  See Compl., ¶ 8.

Plaintiff NJM, as insurer / subrogee for Victoria Fishbein-Koles, brought the instant suit sounding in strict products liability against Hearth.  The Complaint asserts both manufacturing and design defect product liability claims.  See id. at ¶¶ 22-23.  In support of its claims, NJM retained McKinley and a second expert, Frederick.  While presented as an expert by Plaintiff, McKinley did not initially prepare an expert report.  See McKinley Dep. at 7:22-23.  Instead, McKinley provided his opinion by way of deposition testimony and suggested that he followed the National Fire Protection Association ("NFPA") 921 Guide for Fire and Explosion (2008 ed.) in reaching that opinion.  See id. at 32:4-6.  Frederick, by contrast, is a licensed engineer.  While Frederick did provide an initial report, along with deposition testimony, in neither the report nor in his testimony did he refer to the NFPA 921 standards or conduct any independent tests.   He opined that the fire spewing out of the fireplace was caused by a defect in the fireplace unit, namely, that the fireplace generated excessive heat.

Defendant moved for summary judgment on Plaintiff's claims, challenging Frederick's expert testimony as unreliable and arguing that, without the benefit of expert testimony, Plaintiffs' product liability claims fail under New Jersey law.  Defendant, further, argued that the spewing fire may have been caused by an external trigger, such as the items on the fireplace mantel.  Defendant was not able to prove this theory, it continued, because the mantel items had been destroyed before it had an opportunity to test them.

Nonetheless, Defendant pointed to results from its testing of the firebox's contents that indicated Paraffin wax was found within the charred material therein.

On May 5, 2010, this Court held oral argument on Defendant's motion.  That same day, this Court ruled on the record and excluded Frederick's opinion testimony under <u>Daubert</u> and its progeny.  Defendant's motion to exclude McKinley as a fire origin expert was denied.  The Court, further, denied Defendant's contemporaneously filed motion for summary judgment based upon Plaintiff's failure to produce expert testimony.  This Court found expert testimony on product defect unnecessary by holding that NJM could rely on New Jersey's indeterminate product defect test.  <u>See</u> Order dated May 5, 2010 (Doc. 23).[4]

The Court based its ruling on NJM's proffer that Ms. Fishbein-Koles and McKinley would testify at trial that the fire originated from the fireplace.  At oral argument, the Court summarized Plaintiff's proofs as:

> ...what you are telling me is that he is going to rely on the burn pattern.   [McKinley's] testimony about the up-draft or whatever, and how this occurred, and that there are no other electrical sources—and assuming the testimony, or the accuracy of the testimony of Ms. Fishbein-Koles as to what occurred, that there were no items in front of the hearth, and that those are appropriate assumptions on the facts for him to make at this point, and until those facts are determined not believable by someone, he can rely on making his opinions.

Transcript of Motion from May 4, 2010 at 19:12-22 ("Transcript at _:_").  Based on this proffer, along with Ms. Fishbein-Koles eyewitness testimony, I concluded that Plaintiff could proceed under the indeterminate product test:

---

[4]     In addition, Defendant Hearth moved to dismiss, on a spoliation theory, based on NJM's failure to preserve the items on the fireplace mantel.  The Court declined dismissing the product liability claims on that basis, but held that a spoliation inference at trial may be appropriate.

> [s]o the question is:  Can an inference be drawn by everyday jurors that there was a hole in the screen that day, and there was nothing in front of the screen that was a combustible agent there, because the testimony is she had nothing in front of the screen; that it was the heat of the fireplace, and could that be then determined to be a manufacturing or design defect if it would create the hole in the screen, which then would have allowed this fire to go?
>
> I think those are inferences a jury can draw without an expert based on the facts that Ms. Fishbein-Koles will give.  If those facts are disbelieved, which you will go after on cross, there may be a different issue.  But based on those facts, yes, I do believe that is an inference that can be drawn.

Transcript at 31:8-23.  Importantly, NJM conceded that McKinley's testimony was limited to the origin of the fire, *i.e.*, where the fire originated, and agreed that he was not qualified to testify as to whether a product defect within the fireplace caused the fire.  Id. at 12:6-9.

On May 19, 2010 Hearth filed the instant motion for reconsideration.  Citing K & G, supra, Hearth argues that NJM's reliance on the indeterminate product defect test "does not dispense with the need for expert testimony when specific principles beyond the common knowledge of the jury are involved."  Def. Open. Br. at 1.  On June 15, 2010, NJM filed its Opposition with this Court; Hearth replied on June 18, 2010.  For the following reasons, the Court grants Hearth's present motion for reconsideration of the May 5, 2010 Order and, consequently, its motion for summary judgment on Plaintiff's product liability claims.

## II.    STANDARD OF REVIEW

While the Federal Rules of Civil Procedure do not expressly recognize motions for "reconsideration," United States v. Compaction Sys. Corp., 88 F.Supp.2d 339, 345 (D.N.J. 1999), the Local Civil Rules governing the District of New Jersey do provide for such review.  See Light, N.J. Federal Practice Rules, Comment 6 to L.Civ.R. 7.1 (Gann 2008).  Local Civil Rule 7.1(i) states that a motion for reconsideration "setting forth concisely the matter

or controlling decisions which the party believes the Judge or Magistrate Judge has overlooked" may be filed within ten (10) business days after entry of an order.  L. Civ. R. 7.1(i)[5].  The motion may not be used to relitigate old matters or argue new matters that could have been raised before the original decision was reached.  See P. Schoenfeld Asset. Mgmt., L.L.C. v. Cendant Corp., 161 F.Supp.2d 349, 352 (D.N.J. 2001).

"The purpose of a motion for reconsideration is to correct manifest errors of law or to present newly discovered evidence."  Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985), *cert. denied* 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986); Tecchio v. United States ex rel. Meola, Civ. Action No. 03-1529, 2004 WL 2827899, *1 (D.N.J. Oct. 24, 2003) (quoting same).  The granting of a motion for reconsideration is an extraordinary remedy and should be sparingly given by the court.  Connolly v. Mitsui O.S.K. Lines (America), Inc., No. 04-5127, 2010 WL 715775, at *1 (D.N.J. Mar. 1 2010) (citations omitted).  Reconsideration is not appropriate where the motion raises only a party's disagreement with the court's initial decision.  Florham Park Chevron, Inc. v. Chevron U.S.A., Inc., 680 F.Supp. 159, 162 (D.N.J. 1988).

There are three grounds for granting a motion for reconsideration:  (1) an intervening change in controlling law has occurred; (2) evidence not previously available has become available; (3) it is necessary to correct a clear error of law or prevent manifest injustice.  See Carmichael v. Everson, No. 03-4787, 2004 WL 1587894, at *1 (D.N.J. May 21, 2004); Brackett v. Ashcroft, No. 03-3988, 2003 WL 22303078, at *2 (D.N.J. Oct. 7, 2003).  In sum, it is improper on a motion for reconsideration to "ask the Court to rethink what it ha[s] already thought through—rightly or wrongly."  Oritani Sav. & Loan Ass'n v. Fidelity &

---

[5]     This rule previously was Local Civil Rule 7.1(g).

Deposite Co., 744 F.Supp. 1311, 1314 (D.N.J. 1990) (citations omitted).  "The only proper ground for granting a motion for reconsideration, therefore, is that the matters or decisions overlooked, if considered by the court, might reasonably have altered the result reached ...." G-69 v. Degnan, 748 F.Supp. 274, 275 (D.N.J. 1990) (quoting New York Guardian Mortgage Corp. v. Cleland, 473 F.Supp. 409, 420 (S.D.N.Y. 1979)) (internal quotation marks omitted).

## III.    DISCUSSION

Hearth timely filed its motion for reconsideration within 10 days of this Court's May 5th Order.  See Eye Laser Care Ctr, LLC v. MDTV Medical News Now, Inc., No. 07-4788, 2010 WL 2342579, at *1 (D.N.J. Jun. 7, 2010) (citing Staats v. Robinson Helicopter Co., Inc., No. 08-3601, 1989 WL 16071, at *4 n.3 (D.N.J. 1989) (holding that Saturdays, Sundays, and legal holidays should be excluded from the computation)).  Furthermore, Hearth grounds its motion upon new case law, specifically K & G, that was filed shortly after the Court ruled on Defendant's motion for summary judgment, and argues that the Court failed to fully consider the need for expert testimony in light of the scientific principles involved in ascertaining what caused the fire to spew out of the fireplace unit.  Thus, its motion for reconsideration is properly brought.

Generally, under New Jersey law, a plaintiff may prove a product liability claim in one of three ways:

> (1) direct evidence (such as an examining expert's testimony);
>
> (2) circumstantial evidence (such as proof of proper use, handling, and operation of the product); or
>
> (3) evidence that negates other causes of the product failure for which the defendant would not be responsible.

K & G, 2010 WL 1931131, at *3.  Under the indeterminate product test in New Jersey,

> [w]here a plaintiff cannot prove a specific product defect, a product defect may be proved by using a *res ipsa loquitor*-like inference, . . . that is available where the harmful incident (1) was of a kind that ordinarily occurs as a result of a product defect; and (2) was not, in the particular case, solely the result of causes other than product defect existing at the time of sale or distribution.

Id. (quoting Estate of Knoster v. Ford Motor Co., Civil Action No. 01-3168, 2008 WL 5416399, at *3-4 (D.N.J. Dec. 22, 2008)) (internal quotation marks omitted).

As noted, Hearth's central argument is that NJM's reliance on the indeterminate product test does not eliminate the need for expert testimony when scientific principles, outside the scope of common knowledge, are allegedly involved.  See Def. Open. Br. at 1.  Specifically, Hearth argues that NJM's defect theory—that the fireplace generated excessive heat—invokes "complex principles of heat transfer, combustion, and physics."  Id. at 2.  In support of its argument, Hearth relies on the reasoning set forth in K & G, supra.

In K & G, a fire occurred in the rear of a K & G Men's Company Inc.'s superstore, in a tailor shop area leased by the superstore to Ms. Kibalko.  2010 WL 1931131, at *1.  The fire investigator assigned to the case discovered a "severely" fire-damaged steam iron, used by Ms. Kibalko in her shop, which was attached to a similarly scorched power strip.  Id.  K & G filed a Complaint against Ms. Kibalko alleging that she negligently caused the fire by failing to properly turn off the iron after use.  The manufacturer of the iron, and a host of other parties, were joined in the suit.  The central issue in the case was whether expert testimony was necessary to show that the iron's thermostat was defective, malfunctioned, or caused the fire.  Id. at *3.

The court determined that the parties required expert testimony to prove that the iron's thermostat was defective and consequently caused the fire.  Id. at *4.  In reaching

that conclusion, K & G recounts New Jersey case law addressing product defect cases dealing with complex instrumentalities.  First, the K & G Court cites Lauder v. Teaneck Volunteer Ambulance Corps, 368 N.J.Super. 320, 845 A.2d 1271 (2004) for the proposition that "where the allegedly defective product involves a complex instrumentality, a plaintiff is required to provide expert testimony."  2010 WL 1931131 at *4 (quoting Lauder, 368 N.J.Super. at 1277).  Thereafter, the K & G Court notes that expert testimony is required to "assist the fact finder in understanding 'the mechanical intricacies of the instrumentality' and in excluding other possible causes of the accident." Id. (quoting Jimenez v. GNOC Corp., 286 N.J.Super. 533 (App. Div. 1996)).  As an example, the court explains:

> the Appellate Division has required a plaintiff to produce expert testimony to prove that a railroad car's emergency unlocking mechanisms was defectively designed where the plaintiff's hand was jammed in the car's sliding doors and the emergency mechanism failed to open the doors.

K & G, 2010 WL 1931131 at *4 (internal citation omitted).  Based on this case law, the K & G Court specifically held that "expert testimony [was required] to prove that the iron's thermostat was defective, malfunctioned, and caused the fire."  Id.  In that court's view, "[a]lthough the average juror is likely to have experience with irons, such a juror is unlikely to understand the intricacies of an iron's internal operation."  Id.

It is important to note at the outset some factual dissimilarities between K & G and the case at bar.  In K & G, there were two separate and distinct instrumentalities that could have either singularly or collectively contributed to the fire—the iron and/or the power cord.  See id. at *5-6.  And, there was no eyewitness to the fire.  This is significant because the origin of the fire was not clear in that case.  Here, by contrast, there is the eyewitness

testimony of Ms. Fishbein-Koles which suggests that the fire originated in the fireplace, along with McKinley's expert report suggesting the same.

Despite these factual dissimilarities, I nonetheless find K & G's analysis of complex instrumentalities helpful here.  Even though there were two instrumentalities involved, that court focused its analysis on "whether there exists any admissible expert evidence that the thermostat was defective, malfunctioned, and caused the fire."  Id. at *4.  I find particularly persuasive K & G's reasoning that, because "[e]lectrical engineering principles are generally beyond the average juror (and many lawyers)," id. (quoting Laramee v. Warn Indus., Inc., No. 99-c-50337, 2004 WL 1611790, at *5 (N.D.Ill. Jul. 19, 2004), jurors could not rely on their common knowledge to determine whether the iron's thermostat malfunctioned.

Application of this reasoning to the facts here would suggest that reconsideration of my prior ruling is appropriate.  While Ms. Fishbein-Koles' eyewitness testimony and McKinley's expert testimony suggest that the fire originated from the firebox, neither testimony addresses the cause of the fire shooting out of the firebox.[6]  Thus, jurors would be required to rely on their common knowledge to determine that the shooting fire was caused by a defect in the fireplace.  Just as a juror cannot discern the inner workings of an iron's thermostat, one could argue, a juror could not discern the inner workings of an outside-vented gas fireplace.  As Hearth argues, a juror would have to understand "at a minimum . . . whether [the] level of heat [in the firebox] exceeded what would be expected from a fireplace in the absence of defect."  Def. Open. Br. at 6.

---

[6]      As noted, NJM has conceded that McKinley's testimony may not be used to establish causation.

To be sure, my initial ruling was that the Plaintiff could rely on New Jersey's indeterminate product defect test in lieu of expert testimony.  Under that test, "[a] plaintiff may . . . rely on an inference that a product is defective where the incident that harmed the plaintiff was (1) of a kind that ordinarily occurs as a result of a product defect; and (2) was not, in the particular case, solely the result of causes other than a product defect existing at the time of sale or distribution."  Toms v. J.C. Penney Co., Inc., 304 Fed.Appx. 121, 125 n.2 (3d Cir. 2008).

Indeed, in Jerista v. Murray, 185 N.J. 175 (2005), the New Jersey Supreme Court stated that expert testimony is generally unnecessary where the plaintiff relies on the indeterminate product defect test.  The New Jersey Supreme Court explained:

> The question is not whether the instrumentality at issue is complex or simple, but whether based on common knowledge the balance of probabilities favors negligence, thus rendering fair the drawing of a *res ipsa* inference.  Only when the *res ipsa* inference falls outside of the common knowledge of the factfinder and depends on scientific, technical, or other specialized knowledge is expert testimony required.

Id. at 199-200 (internal citations omitted).  Based on this reasoning, the court held that

> an automatic door that closes onto and injures a customer entering a supermarket is an occurrence bespeaking negligence that falls within jurors' common knowledge. In this case, the automatic doors were under [Defendant's] exclusive control, and there was no indication that the accident was Mrs. Jerista's fault. When the average juror can deduce what happened without resort to scientific or technical knowledge, expert testimony is not mandated.

Id. at 200.  The court explicitly rejected the notion that "expert testimony is generally required in a complex instrumentality case to establish the first prong of *res ipsa* ...."  Id. at 198.  While Jerista involved a negligence claim, as opposed to the strict liability cause of

action here, the <u>Jerista</u> Court equated the strict-liability indeterminate product defect test with *res ipsa loquitor* in the negligence context.  <u>Id.</u> at 198 n.3.

Jerista makes clear that the critical question is *not* whether the machinery itself is complex, but whether the juror must resort to scientific or technical knowledge to determine what occurred.  As the court reasoned:

> An automatic door may be a highly sophisticated piece of machinery, but it probably does not close on an innocent patron causing injury unless the premises' owner negligently maintained it.  That conclusion can be reached based on common knowledge without resort to expert testimony. A jury does not need an expert to tell it what it already knows.

<u>Id.</u> at 197.

Where, on the other hand, scientific principles are involved, the court expressed that expert testimony may be required:

> <u>Buckelew [v. Grossbard</u>, 87 N.J. 512 (1981),] a medical malpractice case, illustrates when expert testimony must be provided to allow jurors to draw a *res ipsa* inference. In that case, while conducting an exploratory laparotomy, the defendant surgeon inadvertently cut into the plaintiff's bladder. The plaintiff had to call an expert to explain the standard of care expected of the defendant physician. The plaintiff's expert testified that the defendant " 'deviated from the accepted standards of medical practice' " and asserted that " 'the very fact that this happened indicates that there was a lack of meticulousness or lack of care.'" In that situation, the jurors could not determine, based on their common knowledge, whether the surgeon's deviation "ordinarily bespeaks negligence." Rather, only with the assistance of expert testimony could the jurors decide the question.

<u>Id.</u> at 200 (internal citations omitted).

Upon further reflection, I now conclude that my prior ruling did not sufficiently consider the scientific and technical aspects related to the cause of the fireplace accident. Ms. Fishbein-Koles' testimony describes only that the fireplace unit spewed out flames—

she cannot describe what caused the flames to exit the confines of the firebox.   Nor can McKinley's testimony aid the jury in determining what caused the fire to spew out.  For a jury to conclude that the cause of the fire's spewing was due to an internal defect, it would have to comprehend electrical engineering principles of heat transfer and combustion, *inter alia*.  In other words, while the purpose of the Heat & Glo unit can be understood by the average layperson, a jury could not readily ascertain what caused this device to act in a fashion that did not comport with its intended function.

Furthermore, even if the jury could draw the inference that fire shooting out of the firebox is the kind of incident that ordinarily occurs as the result of a product defect, expert testimony does assist the jury in considering other possible causes of the fire.  Although the indeterminate product test does not require plaintiffs to definitively exclude all other potential causes, it requires the finder of fact to conclude that the spewing fire "was not . . . solely the result of causes other than a product defect existing at the time of sale or distribution."  Toms, 304 Fed.Appx. 121 at 125 n.2.  Here, whether the items placed upon the mantel could not have caused or contributed to the spewing fire would require the jury to determine if the Paraffin wax found in the firebox remains would ignite at a certain temperature and, if so, if its ignition could cause the fire to exit the firebox.  A juror's common knowledge would not encompass the heat transfer and ignition principles required to make that determination.[7]  Because my overlooking of these principles alters

---

[7]        For this reason, the Court rejects NJM's argument that the fireplace is not an "esoteric" instrumentality beyond the province of an average juror's knowledge.  It is true that the fireplace itself is a common item in homes, but the question here is whether an average juror could understand the scientific principles underlying the fireplace's operation and determine to what extent other causes may have contributed to the spewing flames.

the result I reached, <u>see</u> <u>Degnan</u>, 748 F.Supp. at 275, I now conclude that my prior ruling was in error.

NJM disputes this conclusion, relying on <u>Scully v. Fitzgerald</u>, 179 N.J. 114, 127, 843 A.2d 1110 (2004), where the New Jersey Supreme Court held that "[a] jury does not need a fire expert to explain to it the dangers that might follow [when a] lit cigarette is thrown into a pile of papers or other flammable material." <u>Id.</u> at 127.  In that case, the New Jersey Supreme Court addressed whether expert testimony was necessary as to the standard of care applicable to a landlord who permitted tenants to throw cigarette butts near flammable materials in his storage area.  Noting that, "[c]ertain dangerous conditions that create the foreseeable risk of fire are well known to ordinary people and are a matter of common knowledge," <u>id.</u> at 128, that court held that expert testimony was unnecessary.  Needless to say, there are no electrical engineering principles involved in the flammability of cigarette butts thrown onto a stack of paper.  Thus, the Court finds NJM's reliance on <u>Scully</u> unfounded.  Accordingly, I grant Hearth's motion for reconsideration and, consequently, grant summary judgment in its favor on Plaintiff's product liability claims.

## IV.    CONCLUSION

For the reasons expressed above, the Court will GRANT Defendant's motion for reconsideration and enter summary judgment in its favor.  An appropriate Order will follow.


Dated:  October 6, 2010


                                                    __/s/ Freda L. Wolfson____
                                                    Freda L. Wolfson, U.S.D.J.